FILED

2009 Mar-03  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KELTON CIERS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case. No.: 2:07-CV-1199 -JHH** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **Commissioner of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION

Plaintiff, Kelton Ciers, brings this action pursuant to Section 205(g) of the Social Security Act ("the Act") seeking review of the decision of the Commissioner of Social Security ("Commissioner") terminating his entitlement to a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and proper legal standards were applied.

### I.      Proceedings Below

This is a continuing disability review case in which Plaintiff challenges the Commissioner's decision to terminate his benefits. On August 14, 1997, after Plaintiff had protectively filed applications for DIB and SSI in September1994, (R. 26-28, 36-37, 138-41), an Administrative Law Judge ("ALJ") issued a consolidated, fully favorable decision awarding him benefits (the "comparison point decision" or "CPD") because he found that as of August 18, 1994, Plaintiff was disabled due to major depression, dysthymia, somatization disorder, borderline intellectual

functioning, rule out Post Traumatic Stress Disorder ("PTSD"), paranoid personality disorder, borderline personality disorder, and chest wall and wrist pain. (R.138-40).

On June 1, 2001, after consultative examiners evaluated Plaintiff for a continuing disability review and raised the possibility of malingering, (R. 252-57), the Commissioner advised Plaintiff of its determination that his disability had ceased and that his benefits would be discontinued, (R. 149-52). On October 31, 2002, that determination was upheld upon reconsideration. (R. 168-71).

On November 21, 2002, Plaintiff requested a cessation hearing before an ALJ, (R. 172-74), which was scheduled for October 13, 2004, before the same ALJ who previously had allowed his claim. After the hearing commenced, the ALJ continued the proceedings to allow time for Plaintiff to obtain additional medical evidence and to retain counsel. (R. 427-30). Thereafter, Plaintiff's cessation hearing was continued and rescheduled on two other occasions, (R. 431, 433-40, 441-47), before it was finally completed on May 3, 2006, (R. 172-74). Both Plaintiff and Vocational Expert ("VE") James Hare provided testimony at the final May 2006 cessation hearing. (R. 452-78).

Thereafter, on June 28, 2006, the ALJ issued an unfavorable decision finding that Plaintiff's disability had ceased as of June 1, 2001 (the "cessation decision"). (R. 16-25). On April 26, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 7-10), which rendered the ALJ's decision the final decision of the Commissioner, and therefore a proper subject of this court's appellate review. 20 C.F.R. §§ 404.981, 416.1481 (2007).

Plaintiff was thirty-three years old at the time of his disability onset and forty-five years old at the time of the cessation decision. (R. 16, 26, 36, 132, 141). He has a high school education and past relevant work experience (prior to the original finding of disability) as a forklift operator, scrap burner/welder, grinder, and molder-maker's helper, which are classified as unskilled to semi-skilled

positions at the medium to heavy exertional level.  (R. 24, 49-56).  Plaintiff alleges (and the ALJ found in his cessation decision) that Plaintiff continues to suffer from the following impairments, which were present at the time of the CPD:  major depression, dysthymia, somatization disorder, borderline intellectual functioning, rule out PTSD, paranoid personality disorder, and chest wall and wrist pain. (R. 20).  Additionally, Plaintiff alleges that after the Commissioner discontinued his benefits in June 2001, he began suffering from acute gout, left extremity edema, hypertension and class I angina secondary to coronary artery disease. (R. 24).

At the May 3, 2006 hearing, Plaintiff testified that he uses public transportation on a regular basis, does his own laundry, and is able to do his own grocery shopping.  (R. 460-61).  Plaintiff reported that after approximately ten years of abusing alcohol and cocaine, he now is clean and sober after having attended rehabilitation in 2005.  (R. 463-65).  Plaintiff also stated that he gets along well with others, has a good relationship with his step-daughters, and is "trying to get out and . . . mingle."  (R. 466-67). Plaintiff spends his time watching TV, listening to music, and sitting in the yard.  (R. 468-69).  Plaintiff reported that he was not taking any drugs for mental conditions, and he was not under the care of any mental health professionals.  (R. 471-72).

## II.    Legal Standards Applicable to the ALJ Decision

The initial determination of disability under the Act requires a five-step analysis.  *See* 20 C.F.R. § 404.1 *et. seq.*  First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities.  Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet

the physical and mental demands of past work.  The claimant's residual functional capacity consists of what the claimant can do despite her impairment.  Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work. In making a final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and the residual functional capacity are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will provide no further review of the claim.

The "ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform his former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once a claimant shows that he can no longer perform his past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

Thereafter, if the Commissioner determines that disability benefits are due to be awarded to a claimant, as was the case here, those benefits are subject to termination or discontinuation if certain conditions are met.  42 U.S.C. § 423(f); 42 U.S.C. § 1382c(a)(4); *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982).  Accordingly, after an award of benefits has been made, the statutes require that the Commissioner conduct periodic continuing disability reviews.  *See* 20 C.F.R. §§ 404.1594; 416.994 (2007).  In such a review, the pertinent inquiry is whether there has been medical improvement, and whether the medical improvement is related to a claimant's ability to work:

A recipient of benefits under this subchapter or subchapter XVIII of this chapter based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by:

(1)     substantial evidence which demonstrates that

(A)     there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and

(B)     the individual is now able to engage in substantial gainful activity; . . . .

42 U.S.C. § 423(f).

"Medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." 20 C.F.R. § 404.1594(b)(1).   To apply the medical improvement standard, the ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) present at the time of the most recent favorable medical decision finding the claimant disabled, often referred to as the "comparison point decision" or "CPD." 20 C.F.R. § 404.1594(b)(7). If there has been any medical improvement in a claimant's impairment(s), the ALJ must then assess whether this medical improvement is related to the claimant's ability to work.  20 C.F.R. § 404.1594(a).  The regulations provide that medical improvement is not related to the claimant's ability to work if there has been a decrease in the severity of the impairment(s), but no increase in the claimant's functional capacity to do basic work activities. 20 C.F.R. §

5

404.1594(b).  Thus, if there has been any medical improvement in a claimant's impairment(s), but it is not related to the claimant's ability to do work and none of the exceptions applies,[1] the claimant's benefits will be continued.

To guide the ALJ through the determination of whether a claimant continues to be disabled, the regulations set forth an eight-step sequential evaluation process for Title II claims and a seven-step sequential evaluation process for Title XVI claims. *See* 20 C.F.R. §§ 404.1594; 416.994.  The only difference between the two processes is that the performance of substantial gainful activity is relevant to the Title II claim (Step one), but is not relevant to the Title XVI claim.  *See* 20 C.F.R. §§ 404.1594; 416.994.   The court outlines below the eight steps applicable to review of continuing disability for a Title II claim, which, absent consideration of the performance of substantial gainful activity, become the seven steps applicable to review of continuing disability of a Title XVI claim:

Step one:    The Commissioner must first determine whether the claimant is engaged in substantial gainful activity. [Not applicable to Title XVI.]

Step two:    If the claimant is not engaged in "substantial gainful activity," the Commissioner must determine whether the claimant suffers from an impairment which meets or equals the severity of an impairment listed in Appendix 1 of the regulations.

Step three:   If there is no impairment which meets or equals a listing, the Commissioner must determine whether there has been medical improvement. If there is no decrease in the medical severity, there is no medical improvement.

Step four:   If there has been medical improvement, the Commissioner must determine whether such improvement is related to the ability to work, or whether there has been an increase in the claimant's residual

---

[1] The regulations provide: "If your impairment(s) has not medically improved we must consider whether one or more of the exceptions to medical improvement applies." 20 C.F.R. § 404.1594(a). The parties have not argued that any of those exceptions apply here.

functional capacity based on the impairment that was present at the time of the most recent favorable medical determination.

Step five: If there has been no medical improvement found at step 3 or if at step 4, the medical improvement was not related to the ability to work, the Commissioner must determine whether any exceptions to the medical improvement standard exist. If no exceptions apply, the Commissioner will find that the disability continues. If the first group of exceptions applies, continue to step 6. If an exception from the second group of exceptions applies, the Commissioner will find that the disability ended.

Step six: If there has been medical improvement related to the claimant's ability to work or if one of the first group of exceptions to medical improvement applies, the Commissioner must determine whether the claimant currently has a severe impairment or combination of impairments. If not, the claimant is no longer disabled.

Step seven: If the impairment is severe, the Commissioner assesses the claimant's residual functional capacity based on the claimant's current impairments, and whether the claimant can still do the work she has performed in the past. If the claimant is still capable of doing such work, the Commissioner will find that the claimant is no longer disabled.

Step eight: If the claimant cannot do the kind of work that he or she performed in the past, the Commissioner must review the claimant's residual functional capacity and his or her age, education, and work experience to determine whether the claimant is capable of performing any other work which exists in the national economy. If the claimant can, the Commissioner will find that the disability ended. If not, the disability continues.

20 C.F.R. §§ 404.1594; 416.994.

## III.    The ALJ's Decision to Terminate Benefits

In his June 28, 2006 decision terminating benefits, the ALJ considered two distinct, yet interrelated issues.  First, the ALJ compared Plaintiff's condition at the time of the CPD with his condition at the time of cessation to determine whether he had experienced medical improvement

in his impairments that positively impacted his ability to work, *i.e.,* residual functional capacity ("RFC"). Next, because Plaintiff had also developed new impairments since the CPD and even since the June 1, 2001 date of his medical improvement, the ALJ assessed the impact of those new impairments on Plaintiff's revised RFC.

With respect to the first aspect of the ALJ's analysis, he found that, as of June 1, 2001, Plaintiff had experienced medical improvement in his impairments when compared with the earlier CPD of August 14, 1997. (R. 20, Finding Nos. 1, 3; R. 21, Finding No. 6). Specifically, the ALJ noted that at the time of the CPD, Plaintiff had been psychiatrically evaluated and demonstrated paranoia, resistance, and detachment with volatile interpersonal relationships and a history of major depression with psychotic features. (R. 21, Finding No. 6). At that time, the consultative psychiatrist concluded that Plaintiff's impaired ability to understand, remember and carry out instructions, when combined with his extreme difficulty responding appropriately to supervision and co-workers, precluded gainful employment. (R. 21, Finding No. 6).

By contrast, as of June 1, 2001, Plaintiff was no longer receiving treatment for any ongoing mental conditions. (R. 22, Finding No. 6). The ALJ specifically noted the following evidence, which he found to be indicative of improvement in Plaintiff's impairments since the time of the CPD. First, in March 2001, Plaintiff reported on a questionnaire that he had no difficulty concentrating and was able to care for his personal needs, cook, shop, watch television, take public transportation, and read books for up to two hours while remembering what he had read. (R. 22, Finding No. 6). Thus, as of March 2001, there was no indication that Plaintiff was still paranoid nor engaged in volatile interpersonal relationships, as he had been at the time of the earlier CPD. In fact, Plaintiff was living with his girlfriend and two of her children, and he reported good

8

relationships with his step-daughters and efforts to get out and "mingle" with others.  (R. 22, Finding Nos. 6, 7; R. 23, Finding No. 8).

The ALJ also noted that in March 2001, Plaintiff underwent consultative physical and psychological examinations as part of his continuing disability review, and both examiners raised the possibility of malingering.  (R. 22, Finding No. 6).   Plaintiff's physical examination was "essentially normal" and showed Plaintiff had a regular heart rate with no rubs, gallops, or murmurs. (R. 22, Finding No. 6).  Plaintiff's psychological examination revealed that he was well-oriented with clear and normal speech, able to correctly answer informational questions, and able to perform arithmetic problems.  (R. 22, Finding No. 6).  In fact, during the course of those examinations, Plaintiff never mentioned any mental, emotional, or cognitive limitations – only complaining that he could not work because of "a heart condition."  (R. 22, Finding No. 6).

In April 2005, Plaintiff was again consultatively examined with respect to his psychological condition.  The ALJ specifically noted the examiner's finding that "[w]hile historically [Plaintiff] has had significant problems at times getting along with others, he does not appear to be at this time in any acute interpersonal disturbance."  (R., 23, Finding No. 8).  The ALJ noted the examiner's assignment of a Global Assessment of Functioning ("GAF") score of "65," which represents only "mild symptoms or some difficulty in social, occupational, or school functioning" with the ability to "generally function[] pretty well . . . [with] meaningful interpersonal relationships."  (R. 23, Finding No. 8 (citing DSM-III)).

After reviewing all of the evidence of record, the ALJ determined that Plaintiff's medical improvement, as outlined above, was related to his ability to work because it resulted in an increase in Plaintiff's RFC.  (R. 23, Finding No. 9).  The ALJ noted that as of June 1, 2001, Plaintiff's

9

condition had so improved that he was able "to maintain concentration and attention, interact appropriately with supervisors and co-workers, maintain ordinary activities of daily living, [and] understand, remember and carry out simple instructions." (R. 22, Finding No. 7).

The ALJ's analysis did not end there, however.  In developing Plaintiff's RFC, the ALJ also considered the impact of the following new impairments, which developed as of, and since, his medical improvement occurred in June 2001:  acute gout, left extremity edema, hypertension and class I angina secondary to coronary artery disease. (R. 24, Finding No. 10).  Although the ALJ characterized these impairments as "severe," he found that they cause little more than minimal limitation on Plaintiff's ability to perform work activities.  (R. 24, Finding No. 10).  Specifically, the ALJ noted:

> Even though [Plaintiff] now has acute gout, left extremity edema, hypertension, and class I angina, he has not been restricted in any way by any treating physician, and on September 22, 2005, he denied chest pain at rest or with exertion, shortness of breath, or irregular heartbeats.  He denied weakness or joint pain, and he was in no distress.  He breathed effortless[ly] and normal[ly] and was properly oriented to time, place, and person.

(R. 23, Finding No. 8).  After reviewing all of the evidence of record, the ALJ found that Plaintiff's allegations concerning his functional limitations and his inability to work were not fully credible. (R. 23, Finding No. 8).

Thus, having considered not only the issue of medical improvement, but also the impact of new impairments, the ALJ determined that as of June 1, 2001 (the Commissioner's date of medical improvement), Plaintiff retained the ability to perform some level of work, although Plaintiff's "residual functional capacity to perform the full range of light work . . . had been impeded by non-

exertional limitations."  (R. 25, Finding No. 15).  Essentially, the ALJ found that Plaintiff has the RFC to perform a limited range of light work, the parameters of which are as follows:

> simple but not complex tasks and maintain attention and concentration at those tasks for an eight-hour workday provided customary breaks are given. . . . The claimant's contact with the general public and co-workers should be casual, and supervision should be non-confrontational and casual. . . . He may miss one to two days of work per month.  Changes to the work setting should be gradual; however, he could adjust to day-to-day plans.  He is unable to work around unprotected heights or dangerous moving equipment and no ladders, ropes, or scaffolds.

(R. 23, Finding No. 8).

The ALJ utilized testimony from a VE to determine "the extent of erosion of the unskilled light occupational base caused by these limitations."  (R. 25, Finding No. 15).  With the help of that testimony, the ALJ found that Plaintiff could not perform his past relevant work because it required medium to heavy exertion.  (R. 24, Finding No. 11).  Nevertheless, the ALJ determined that Plaintiff could perform other unskilled jobs at the light exertional level which exist in significant numbers in the national economy, including production assembler, garment sorter, electronics worker, and off-bearer.  (R. 24, Finding No. 11;  R. 475).  Thus, the ALJ found the Commissioner's cessation assessment to be correct, and he concluded that Plaintiff's disability ceased as of June 1, 2001.  (R. 25, Finding No. 16).

## IV.    Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed, or in the alternative, remanded for further consideration.  (Doc. # 8, at 8).  Plaintiff argues that, for the following reasons, the ALJ's decision is not supported by substantial evidence and improper legal standards were applied: (1) the ALJ's mental RFC findings are based upon his inappropriate, partial rejection of the

consultative examiner's opinion; and (2) the ALJ's physical RFC findings fail to comply with SSR 96-8p "calling for a specific function-by-function analysis" and fail to take into account the entire period through the date of decision.  (Doc. # 8, at 5-8).

## V.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision,  *see* 42 U.S.C. § 405 (g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

VI.     **Discussion**

With that backdrop of applicable standards, the court rejects Plaintiff's arguments for remand and/or reversal.  Plaintiff's arguments essentially relate to the two aspects of the ALJ's analysis: (1) the ALJ's finding of medical improvement is flawed because he inappropriately rejected part of the consultative examiner's opinion when determining Plaintiff's mental RFC; and (2) the ALJ's assessment of the impact of Plaintiff's post-cessation, post-medical improvement impairments, which are primarily physical in nature, is flawed because his physical RFC fails to comply with SSR 96-8p "calling for a specific function-by-function analysis."   The court rejects both of these arguments and finds that the ALJ's opinion was guided by proper legal standards and is supported by substantial evidence.

A.      **The ALJ's Mental RFC Assessment**

Plaintiff's primary concern with the ALJ's assessment of Plaintiff's mental RFC is his decision to discount the opinion of consultative examiner Dr. Samuel Saxon, which was formulated after Dr. Saxon's April 2005 examination of Plaintiff.  (Doc. # 8, at 5).  The weight properly afforded to a medical opinion regarding the nature and severity of a plaintiff's impairments depends upon a number of factors, including the source's examining and treating relationship with the plaintiff, the evidence presented to support the opinion, the consistency of the opinion with the record as a whole, and the speciality of the medical source.  *See* 20 C.F.R. § 416.927(d).  The opinion of any physician may properly be discounted for good cause. *Crawford v. Commissioner*, 363 F.3d 1155, 1159-60 (11th Cir. 2004).

Dr. Saxon's April 2005 consultative opinion of Plaintiff was submitted in two formats: (1) a four-plus page narrative evaluation; and (2) a one-plus page check-the-box "Medical Source

Opinion Form (Mental)" (the "Form"), which requests that the practitioner assess the claimant's degree of functioning in a number of ability areas by choosing one of the following ratings: "none," "mild," "moderate," "marked," or "extreme." (R. 323-29). The Form also requests that the practitioner "identify the particular medical or clinical findings . . . which support your assessment of any limitations." (R. 328). The first part of Dr. Saxon's opinion, the lengthy narrative evaluation, outlines his impressions of Plaintiff, dictates the results of his examinations, sets forth his recommendations, and culminates in diagnoses of dysthymia, major depression in remission, and borderline mental retardation. (R. 323-27). The second part of his opinion, the two-page Form, includes the following "checked box" ratings of functionality: (1) "mild" limitations in maintaining social functioning and maintaining activities of daily living; (2) "moderate" limitations in responding appropriately to co-workers, responding appropriately to customers or other members of the general public, using judgment in simple one or two step work-related decisions, dealing with changes in a routine work setting, understanding, remembering, and carrying out simple, one and two-step instructions, and maintaining attention, concentration or pace for periods of at least two hours; (3) "marked" limitations in responding appropriately to supervisors, and understanding, remembering, and carrying out detailed or complex instructions; and (4) no "extreme" limitations in any area. (R. 328-29). Dr. Saxon's Form failed to identify *any* medical or clinical findings in support of his assessments. (R. 328-29).

Plaintiff's only challenge to the ALJ's review of Dr. Saxon's opinions is his decision to discount Dr. Saxon's "checked box" rating that Plaintiff suffers from "marked" limitations with regard to his ability to respond appropriately to supervisors. (*See* Doc. # 8, at 5 (referring to R. 23,

Finding No. 8; R. 328-29)[2]).  While it is true that the ALJ rejected that small portion of Dr. Saxon's

ratings,[3] the court finds no error because the ALJ articulated good cause for doing so.  In rejecting

Dr. Saxon's summary conclusion, the ALJ noted statements from Saxon's own evaluative narrative

that are inconsistent with such a conclusion.  For instance, Dr. Saxon observed in his report that

"[w]hile historically [Plaintiff] has had significant problems at times getting along with others, he

does not appear to be at this time in any acute interpersonal disturbance." (R. 23, 326).  Moreover,

as the ALJ noted, Dr. Saxon assessed Plaintiff with a GAF score of 65, indicating only mild

symptoms and the ability to "generally function[] pretty well . . . [with] meaningful interpersonal

relationships."  (R. 23).  Although Dr. Saxon's rating of Plaintiff's ability to respond to supervision

clearly deviated from his narrative evaluation of that same skill, he utterly failed to note on the Form

any medical or clinical findings that would explain his rating.

   Moreover, Plaintiff's own testimony regarding his ability to relate to others also supports the

ALJ's decision to discount Dr. Saxon's assessment of "marked" limitation in this area.  Plaintiff

confirmed that his drug and alcohol abuse caused his prior relationship struggles, but he testified that

now that he is in remission from substance abuse, he gets along well with others, tries to get out and

_____

   [2] Plaintiff's brief argues:

> In formulating his RFC findings, the ALJ rejected in part the opinion of the
> consultative psychologist Dr. Saxon who performed an examination in April 2005
> in SSA's behalf (R. 323-329). The ALJ rejected this mental health professional's
> finding of marked limitation in responding to supervisors on the basis that Dr. Saxon
> elsewhere noted that the Plaintiff does not appear to be in any acute interpersonal
> disturbance (R. 23).

(Doc. # 8, at 5).

   [3] It is not insignificant that the ALJ adopted the majority of Dr. Saxon's opinions - a decision
which Plaintiff does not challenge.

15

mingle, and has good relationships with his step-daughters. (R. 23, 462-63, 465-68).  Because the

ALJ had good cause to discount[4] a portion of Dr. Saxon's consultative opinion, the court finds no

error in that decision.[5]

     Indeed, the ALJ's assessment of Plaintiff's mental RFC - which was much improved from

the earlier CPD - is supported by substantial evidence.  As noted earlier, as of June 1, 2001, Plaintiff

was no longer receiving treatment for any ongoing mental conditions.  (R. 22, Finding No. 6).  Just

a few months before that, Plaintiff *himself* reported an increase in his ability to concentrate, maintain

---

[4] Plaintiff's argument that the ALJ should have sought additional medical opinions rather than rejecting portions of Dr. Saxon's report misses the mark.  Plaintiff's contention is based upon the flawed assumption that Dr. Saxon's services "failed to resolve [an insufficiency or inconsistency in the record] and in fact created another one," thus triggering the ALJ's "duty to develop a full and fair record," "including re-contacting the source for clarification."  (Doc. # 8, at 5).  Although recontacting a treating physician may be the proper action to take if an ALJ needs clarification as to that physician's opinion, *see* SSR 96-5p, 61 Fed. Reg. 34471, 34472 ("[T]he rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us."), that is not what occurred here.  In this case, the ALJ needed no clarification of Dr. Saxon's rating on the Form– the ALJ had before him a well-developed record regarding Plaintiff's ability to respond to supervision which *included* Dr. Saxon's own evaluation notes, attached thereto.  Neither would it have been necessary for the ALJ to seek additional medical opinions on the matter. This is not a case where the record was inadequate for the ALJ to make a disability determination.  *See* SSR 96-2p, 61 Fed. Reg. 34490, 34491 (1996) ("Ordinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed.").  Thus, under the circumstances in this case, it was not improper for the ALJ to discount a portion of Dr. Saxon's opinion without recontacting him or seeking other costly and superfluous opinions on the same issue from additional medical sources.

[5] In any event, had the ALJ accepted the entirety of Dr. Saxon's opinion including the minute portion that he discounted, there is no indication that the ALJ's conclusions would have been any different.  At the hearing, Plaintiff's attorney asked the VE to consider Dr. Saxon's opinion as a whole without any portion discounted.  Even considering Plaintiff's abilities completely from Dr. Saxon's point of view, the VE found that Plaintiff's abilities were *consistent* with a person who could perform the jobs recommended by the VE and adopted by the ALJ in his opinion.  (R. 23, 323-29, 475-77).

activities of daily living, carry out instructions, and interact with others, and as of June 1, 2001, there

was no indication that Plaintiff was still paranoid nor engaged in volatile interpersonal relationships.

(R. 22, Finding Nos. 6, 7; R. 23, Finding No. 8).  Consultative evaluations in both March 2001 and

April 2005 confirmed Plaintiff's improved mental status, which further supports the ALJ's RFC

assessment.  For all of these reasons, the court finds that the ALJ's decision to discount Dr. Saxon's

form opinion, and his resulting mental RFC formulation, was appropriate, guided by proper legal

standards, and supported by substantial evidence.

> **B.**      **The ALJ's Physical RFC Assessment**

Next, Plaintiff disputes the ALJ's physical RFC findings, which he believes did not

meaningfully nor adequately take into account his new impairments of acute gout, left extremity

edema, hypertension, and class I angina secondary to coronary artery disease.  Plaintiff claims that

the extent of the ALJ's consideration of his new physical ailments was the addition of "only a few

token environmental restrictions at the end of his RFC findings relating to heights and dangerous

machinery" and that his RFC fails to comply with Social Security Ruling 96-8p because it lacks a

function-by-function analysis. (Doc. # 8, at 6)(citing R. 23, R. 474-475).  To the contrary, the ALJ's

decision as a whole not only indicates that he considered the impact of Plaintiff's "new" impairments

on his ability to work, but that his evaluation of those impairments is supported by substantial

evidence.

It is apparent from the ALJ's opinion that he adequately surveyed the evidence relating to

Plaintiff's new impairments. First, the opinion notes that Plaintiff underwent angioplasty in May

2005 with stent placement and was also treated for acute prostatitis in August 2005.  (R. 20, Finding

No. 4).  The ALJ also recognized that Plaintiff suffers from acute gout, left extremity edema,

hypertension, and class I angina.  (R. 24, Finding No. 8).  Although the ALJ characterized these impairments as "severe," he found that they cause little more than minimal limitation in Plaintiff's ability to perform work activities.  (R. 24, Finding No. 10).  Specifically, the ALJ noted the absence of any medical opinion that these impairments limit him in any work-related way:

> Even though [Plaintiff] now has acute gout, left extremity edema, hypertension, and class I angina, he has not been restricted in any way by any treating physician, and on September 22, 2005, he denied chest pain at rest or with exertion, shortness of breath, or irregular heartbeats.  He denied weakness or joint pain, and he was in no distress.  He breathed effortless[ly] and normal[ly] and was properly oriented to time, place, and person.

(R. 23, Finding No. 8).  Having considered all of the evidence of record, the ALJ found that Plaintiff's subjective complaints concerning his functional limitations and his inability to work were not fully credible.  (R. 23, Finding No. 8).  Based upon the lack of medical restrictions related to those conditions, the ALJ determined that Plaintiff's new impairments caused no exertional limitations, and this was reflected in his RFC findings. (R. 22-23, Finding No. 8).

The evidence of record related to those new impairments, a review of which follows, supports the ALJ's assessment thereof.  (R. 369-90).  In August and September 2005, Plaintiff was seen by a urologist for prostatitis and kidney flank pain.  (R. 371-80).  After a round of antibiotics, he reported as of the September appointment that he was minimally bothered by his symptoms and that his pain was improving.  (R. 371-73, 378-80).  After a symptom review and physical examination at both visits, Plaintiff's cardiovascular findings were found to be normal - he had no chest pain at rest or on exertion, no irregular heartbeat, no swelling in the ankles, and no shortness of breath.  (R. 371-72, 378-79).  At both visits, Plaintiff was prescribed antibiotics for infection, and he was advised to take ibuprofen for pain.  (R. 371-73, 378-80).

The record also contains evidence relating to Plaintiff's stent placement and heart condition. (R. 381-90).  In May 2005, Plaintiff had a cardiac cath with PTCA and stent placement for Class 1 angina secondary to coronary artery disease and hypertension.  (R. 385-90).  At his one-month surgery follow-up in June 2005, Plaintiff still complained of chest pain with anxiety and stress, but his EKG revealed normal sinus rhythms, his blood pressure was at goal, and he was released to participate in exercise.  (R. 385).  Six months later in January 2006, Plaintiff returned for another follow-up for his stent placement.  (R. 383-84).  Although Plaintiff reported occasional, sharp chest pain, he denied dyspnea and admitted that he was under stress because his mother had just died.  (R. 383).  His physical examination was essentially normal – sinus rhythm within normal limits and no ischemia by stress thallium study – and Plaintiff was diagnosed with atypical chest pain and advised to take Prilosec.  (R. 383-84).

Indeed, the above-referenced records reveal no physical limitations from Plaintiff's new impairments that would require the ALJ to append his RFC with additional exertional restrictions. With respect to the prostate problems, the heart condition, and the blood pressure situation, Plaintiff showed improvement.  As the ALJ observed, none of Plaintiff's doctors indicated ongoing physical limitations that would impact his ability to work.  The court finds that the ALJ's analysis comports with Social Security Ruling 96-8p.  "Although the ALJ may not have discussed this evidence in as much detail as Plaintiff would have liked," (Doc. # 10, at 14), the Eleventh Circuit has made clear that there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, … is not a broad rejection of the evidence which is 'not enough to enable [the district court] … to conclude that [the ALJ] considered h[is] medical condition as a whole.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (quoting *Foote v. Chater*, 67

F.3d 1553, 1561 (11th Cir. 1995)).  In this case, it is apparent that the ALJ considered the whole of

Plaintiff's condition as it existed at each point along the way - at the time of the CPD, when Plaintiff

reached medical improvement, and at the time of the cessation decision.

Even Plaintiff's brief seems to admit that the medical evidence related to his new

impairments supports no additional exertional limitations, arguing instead that the ALJ should

manufacture limitations because his conditions sound like they are severe enough to result in

limitations.  According to Plaintiff, "[o]n its face, these conditions would as a matter of reasonable

medical certainty and even common knowledge, result in some exertional and postural limitations."

(Doc. # 8, at 7-8).   That is not enough to satisfy his burden.

As a final matter, it has not escaped the court's attention that the ALJ's opinion is not a

model of clarity. For example, although it is apparent from the entirety of the ALJ's opinion that he

believes that Plaintiff can perform a limited range of light work, the words "light work" do not

appear until the end of the opinion.  (*See, e.g.,* R. 24-25, Finding No. 15).  Indeed, although Finding

No. 8 outlines the specific non-exertional limitations that restrict Plaintiff from performing a full

range of work, the ALJ failed, at that point, to name *what* range of work applied.  (R. 23, Finding

No. 8).[6]  Although it certainly would have made sense for the ALJ to have specified the applicable

---

[6] As noted earlier, those non-exertional limitations include:

> simple but not complex tasks and maintain attention and concentration at those tasks
> for an eight-hour workday provided customary breaks are given. . . . The claimant's
> contact with the general public and co-workers should be casual, and supervision
> should be non-confrontational and casual. . . . He may miss one to two days of work
> per month.  Changes to the work setting should be gradual; however, he could adjust
> to day-to-day plans.  He is unable to work around unprotected heights or dangerous
> moving equipment and no ladders, ropes, or scaffolds.

(R. 23, Finding No. 8).

range before modifying that range with additional limitations, that is not what happened here. Instead, the ALJ clarified in Finding No. 15 of his opinion that Plaintiff's "residual functional capacity to perform the full range of *light work . . .* had been impeded by non-exertional limitations," (R. 25, Finding No. 15)(emphasis added), which had previously been outlined.   And lest any confusion still abound, the ALJ also reiterated that he utilized testimony from the VE at the hearing to determine "the extent of erosion of the unskilled *light occupational base* caused by these limitations."  (R. 25, Finding No. 15)(emphasis added).

Although Plaintiff's brief highlights these organizational oversights in the ALJ's opinion, (Doc. # 8, at 6-8), they are not cause for remand.  Even without a bullet-point outline of the ALJ's findings, the full context of the opinion, considered in conjunction with the hearing transcript of the VE examination, illuminates the ALJ's finding that Plaintiff's ability to work lies with a restricted range of the light exertional level.[7]  Remand is not warranted merely to request a perfect opinion. *See e.g., Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997). *See also Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (finding that procedural perfection in administrative proceedings is not required because the court should not vacate a judgment unless the substantial rights of a party have been affected); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (opining that no principle of administrative law or common sense requires the Commissioner to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result).  To

---

[7] Plaintiff apparently believes that the ALJ's failure to specifically state "light work" when articulating RFC limitations is an acknowledgment that "he had omitted the physical RFC from adequate consideration." (Doc. # 8, at 6).  That simply does not follow.  It is apparent throughout the ALJ's opinion and his examination of the VE at the hearing that he has restricted Plaintiff to a limited range of light work, and in any event, the ALJ did not fail to consider Plaintiff's physical limitations – there simply were no additional physical limitations supported by the record.

remand for the ALJ to reorganize his RFC findings so that they flow perfectly and practically would be a waste of judicial resources. The court has taken care to focus not on whether the ALJ's prose could be organized more fashionably or articulated more clearly, but on whether the ALJ's findings are guided by proper legal standards and supported by substantial evidence.  For all of the reasons outlined above, they are.

**VII.    Conclusion**

Accordingly, the court concludes that the ALJ's determination that Plaintiff is no longer disabled and thus, his benefits should be terminated, is supported by substantial evidence and proper legal standards were applied in reaching this determination.  The Commissioner's final decision is due to be affirmed, and a separate order in accordance with this memorandum opinion will be entered.

**DONE** this the   3rd    day of March, 2009.

_____
SENIOR UNITED STATES DISTRICT JUDGE